SMITH *v.* STATE.

(In Banc. April 15, 1940.)

[195 So. 327. No. 33751.]

J. **Hunter Garth**, of Hazlehurst, and **Barnett, Jones & Barnett** and **John E. Stone**, all of Jackson, for appellant.

104

**W. D. Conn, Jr.,** Assistant Attorney-General, and **M. S. McNeil,** of Hazlehurst, for appellee.

Argued orally by **J. H. Garth,** for appellant, and by **M. S. McNeil** and **W. D. Conn, Jr.,** for State.

**McGehee, J.,** delivered the opinion of the court.

This is an appeal from the circuit court of Copiah County wherein appellant was indicted, tried, and con-

victed of murder, and sentenced to serve a life term in the state penitentiary.

This is the second appearance of the case here on appeal. . The former record disclosed that the appellant at the time of the first trial was under indictment jointly with his wife for the murder of her father, T. E. Allen, and it was shown that her mother, Mrs. T. E. Allen, was also killed by the appellant on the same occasion. He was tried and convicted of the murder of T. E. Allen and sentenced to be hanged. On appeal the judgment and sentence were reversed and the cause remanded for a new trial. Smith v. State (Miss.), 185 So. 193. On the record then before us, the several judges entertained widely divergent views as to what decision should be rendered here. Two were of the opinion that the conviction and death sentence then appealed from should be affirmed; two were of the opinion that the testimony of the appellant and his wife, who were the only eye-witnesses to the actual killing, was not unreasonable to that degree which would render it unbelievable, and that their version of what happened at the scene of the killings was not substantially contradicted by the physical facts or by the facts of common knowledge. Hence, under the rule announced in such cases as Weathersby v. State, 165 Miss. 207, 147 So. 481, those two judges thought that the appellant was entitled to the peremptory instruction requested in the trial court; and the other two judges were of the opinion that under the record as then presented no more than a conviction of manslaughter could be allowed to stand.

Also, on the former appeal some of the judges were of the opinion that in view of the fact that the appellant was confronted with the necessity of using his wife as the only other eye-witness to the killings, he should not have been required to undergo the disadvantage of having her remain under the cloud of the joint indictment against them while he was on trial in the absence of any substantial evidence of her participation in the alleged

crime; and it was suggested in the opinion that unless additional proof against her should become available, the indictment as to her should be nol-prossed before the appellant was again put to trial. Those judges were also of the opinion that certain evidence offered by the appellant should not have been excluded from the consideration of the jury. Accordingly, these objections were obviated at the second trial, and in our opinion there is nothing contained in the record on this appeal to indicate that the appellant was not given a fair and impartial trial, free of prejudicial error; unless it can be said that he was either entitled to a peremptory instruction in his favor under the rule announced in the case of Weathersby v. State, supra, or unless he should have been convicted only of manslaughter.

The appellant contends: (1) that under the former opinion of the Court in this case, the trial court was without power to try him again for a higher crime than that of manslaughter; and (2) that he was entitled to a peremptory instruction on the ground hereinbefore stated. In reply to the first contention, we deem it only necessary to say that the trial court was not required to anticipate that the evidence on behalf of the state in support of the charge of murder would be no stronger than that offered on the first trial. We shall therefore confine this opinion to the second contention above stated, and shall state the facts which, in our opinion, support and sustain the verdict rendered.

It is shown by this record that the appellant, who was accustomed to carry his shotgun with him in connection with his work of killing certain species of wild life for use in the Copiah-Lincoln Junior College in the teaching of its course in natural history, went on the afternoon of the killings, in company with his wife and child, to the farm where Mr. and Mrs. Allen lived and kept house for June Wilson and Homer Simmons; that Mrs. Joe Smith and her small child, less than two years of age, remained at the house while the appellant Joe Smith, went down in

the field where Wilson and Simmons were at work; that while the appellant was down in the field his wife came from the house and reported that she had gotten into a quarrel with her parents and that her father had told her mother to pick up a stick and knock her brains out. In response to this report, it was shown that the appellant suggested to her that she: "Pay no attention to those old people as they have been nagging us ever since we have been married." It appears from the testimony that the alleged quarrel between the appellant's wife and her parents arose from a complaint on their part that in the exchange of work between her and her husband and Wilson and Simmons, she had worked in the field alone with Homer Simmons, who had shown an interest in her prior to her marriage,—her parents thinking that it was improper for her to be alone with Simmons in the field in the absence of her husband, and having reprimanded her on account thereof. Within a few minutes after she went to her husband and reported the quarrel that afternoon. They then immediately returned to the house where he had left his loaded shotgun setting in his car between the brake shift and the lever, some eight or nine steps, according to the appellant's testimony, from the south end of the porch of the house, which faced west; but some 35 or 40 feet away, according to other testimony, as the car faced southwest.

There was a 40 foot porch about 7 feet wide extending all the way across the front of the house, and the posts thereon were approximately 7 feet apart, three of them being on the south side of the front steps and three on the north side thereof.

Appellant claims that when he arrived at his car in company with his wife and child for the purpose of leaving and returning to their own home, Mr. Allen called to him from the porch and said: "I want to talk to you;" that he thereupon advanced from the car, without his shotgun, until he reached the post at the south end of the porch, and stopped; that Mr. Allen was at that time

standing at the first post south of the steps and said to the appellant: ''Come on up here, I am not going to gun you;'' that he, the appellant, then advanced to the second post and that Mr. Allen then moved or ''twisted his body'' and that a large dirk knife, contained in a scabbard, then fell from Mr. Allen to the floor; that he picked it up and said: ''This is what I am going to use on you,'' and began advancing toward the appellant with the knife still in the scabbard; that thereupon Mrs. Allen came out onto the porch, from a hall which extended all the way through the house, with a shotgun in her hand, and that he then ran to his car, which the proof shows was at least 30 feet or more from where he says that he was then standing, and obtained his shotgun from the side of the car farthest away, and returned to a point in front of the porch where he says that he saw Mrs. Allen first point the gun toward him, and then toward his wife, who was standing 5 or 6 feet from the south end of the porch with her child in her arms. That while Mrs. Allen had the gun pointed toward the wife and child of appellant, Mr. Allen was saying: ''Shoot, shoot, shoot the son of a bitches or let me have the gun,'' etc.; that the appellant then shot and killed Mrs. Allen to prevent her from shooting his wife and baby—her daughter and grandchild; that when Mrs. Allen fell, with her head near the outward edge of the porch, the shotgun fell with the stock or butt turned toward the wall of the house; that Mr. Allen then went over between the gun and the wall and stooped down to pick up the gun to shoot the appellant, and that when he stooped over and reached for the gun, while facing the appellant, he had this dirk-knife which was still in the scabbard in his right hand, and that the appellant then shot and killed him. His body was found on the porch north of the entrance to the hall several feet from the shotgun, and his back was turned toward the wall. The dirk-knife, which had not even at that time been removed from the scabbard, was found behind his knees and toward the wall. Two chairs were found about

3 feet apart between the front steps and the entrance to the hall, and near one of which Mr. Allen's hat was found on the floor. Two shells were found on the ground about 3 inches apart which had been released from underneath the appellant's pump gun, but some few feet from where he testified that he was standing at the time he did the shooting and about 4 feet from the edge of the porch, and which shells the jury may have had good reason to believe would ordinarily have fallen perpendicularly from underneath the gun to the ground instead of out to one side from where the appellant claims to have stood. He was asked to demonstrate to the jury and explain how the shells could have been where they were found. The jury had occasion to observe his effort while holding the gun in trying to demonstrate his theory. Moreover, it was shown that Mrs. Allen was shot in the right breast and that two pieces of the thick part of the wadding from the shell were removed from her heart by the physician. The wife of the appellant undertook to explain and demostrate with the gun how it could be that her mother had the gun in a shooting position pointed toward her and the baby at the time she was shot by the appellant, without any of the shot striking her mother's right arm or the stock of the gun. The jury observed her effort in that behalf, and likewise the effort of the appellant who followed his wife on the stand and held the gun in a different position than his wife had held it before the jury, as appears from his cross-examination. Appellant's wife also contended that when they left the scene of the alleged crime the stock or butt of the gun was toward and near the body of Mrs. Allen, and that the barrel was toward the wall; whereas, the appellant testified that the stock or butt of the gun fell toward the wall and away from where the body was lying.

It was the state's theory that Mr. and Mrs. Allen were seated in the two chairs hereinbefore mentioned at the time the shooting began, and while it was shown by the examining physician that the shot in Mr. Allen's body

took effect in the left breast and arm and ranged downward from five to thirty degrees, he testified that in his opinion Mr. Allen's body was erect when he was shot, whether seated or standing. It is deducible from his testimony that he was reluctant to assume that the man firing the shots was standing on the ground at the time.

Three witnesses, two of whom were introduced by the state and one by the appellant, testified on the second trial, but not on the first trial, that they heard one shot, then a woman scream, and then the second shot. The physician testified that it was absolutely impossible for Mrs. Allen to have screamed after she was shot, since the wadding from the shell of the gun penetrated her heart, causing instantaneous death. The wife of the appellant, who was the only other woman present, testified that she, the witness, did not scream at any time during the shooting, and from which testimony the state contends that Mr. Allen was shot first while seated in the chair, a few feet to the rear of which his body was found, and near which chair his hat lay. There was also some of the thick portion of the wadding found on the south and north side of the steps, the one on the north side being on the floor at a nearby post, and in the range from which the appellant would have returned from his car, and not in the range from which the shot would have been fired toward Mr. Allen if he had been undertaking to pick up the shotgun where it was later found on the floor. It was for the jury to say whether this wadding would have followed the range of the shot, instead of going several feet to the left of where the appellant says Mr. Allen was reaching for the gun at the time he shot him.

The physician further testified that in his opinion Mr. Allen was approximately twice as far from the appellant when the shooting occurred as was Mrs. Allen. No wadding entered the body of Mr. Allen, nor were there any large wounds found thereon. It was therefore for the jury to consider whether or not the appellant fired upon Mr. Allen when some distance away and while re-

turning from the automobile with the shotgun before he came to where the first shell was released from the gun, prior to the shooting of Mrs. Allen, and where the second one was likewise released. Moreover, the jury may have attached some importance to the location of a spot of blood on the porch the size of an ordinary dinner plate, and which was found between the two bodies, which lay 11 feet apart, and the presence of which spot of blood was not shown on the first trial.

It was further shown that a young man, Otis Walker, had left a school bus before coming in sight of the house and that when he had reached a point in front of the house, but some little distance therefrom, he saw a woman, who was later shown to have been the wife of the appellant, come around the north end of the house with a towel in her hand and approach the body of Mrs. Allen and push it farther back onto the porch on account of the fact that her head and shoulders had been hanging partly over the edge; that he later saw this woman join the appellant near a smoke-house, where he left them standing together as he went on to the home of his brother-in-law, Dewey Kemp, whom he notified as to what he had seen. The appellant and his wife claim that immediately after the shooting he took the baby from her arms below the south end of the porch and that his wife went directly from there to the body and moved it, and that he then went on around behind the house to call June Wilson and Homer Simmons. She claims that she went from the body on up the front steps on that occasion and on down the hall to the water shelf where she washed her hands and obtained the towel, and that she then went immediately and joined her husband and Homer Simmons at the rear of the house. June Wilson and Homer Simmons had come forthwith to the scene after they heard the shooting, and June Wilson says that they met the appellant about 50 yards north of the house and that he did not see the appellant's wife any more at all before he left there and went to notify a neighbor, Jack

Tanner.  If the wife of the appellant joined her husband and Homer Simmons at the rear of the house after the killing, as she says she did, then it was for the jury to consider whether or not one or more of them had ample opportunity to have placed Mr. Allen's shotgun and dirk-knife where they were found on the floor by those who arrived at the scene soon thereafter, it being shown that after June Wilson had left and before anyone else arrived, Homer Simmons had assisted the appellant and his wife to start their car to enable them to leave en route to the sheriff's office, and that Homer Simmons then left the scene to notify other neighbors.

On the former appeal, it was shown that the sheriff's office had caused certain finger-prints to be taken to ascertain who had handled the weapons found on the porch, but the result of this investigation was not disclosed, and on the former appeal the state's evidence was in the opinion of some of the judges subject to an unfavorable inference because of such failure.  It is now made clear, however, that no satisfactory evidence could have been disclosed by the taking of the finger-prints for the reason that the deputy sheriff, Shelby Robinson, testified that when he arrived at the scene, in company with Phil Massa and Johnnie Kees, the shotgun was picked up by Kees from the floor on the porch, where the testimony for the State, and the photographs taken that afternoon and introduced in evidence, disclose that it was found; and that he then handed it to the deputy, who thereupon unbreeched it, removed the shell, and carried it in his car to the sheriff's office.  The proof also shows that the justice of the peace, upon arriving at the scene shortly after the killing, picked up the dirk-knife and scabbard, removed the knife from the scabbard with his hand, and then replaced it therein; that this handling of these two weapons occurred before any finger-prints could have been taken.

The wife of the appellant admitted that she had never known her mother to have fired a shotgun, and the jury

doubtless had good reason to believe that it was unnatural, unreasonable, and unbelievable that Mrs. Allen would have attempted to kill her own daughter and grandchild under the circumstances disclosed, or that Mr. Allen would have stood idly by, at a time when Mrs. Allen was alleged to have been passing him on the porch with the shotgun and advancing on her daughter and grandchild, and thereby permit the appellant to go as far as he did to the car and return, without taking charge of the gun which Mrs. Allen is said to have had and protecting their own lives from impending danger at the hands of the appellant. At any rate, we are unable to say from all of the evidence in the case that the testimony of the eye-witnesses is not contradicted by the physical facts, and by the facts of common knowledge. The version given by the appellant and his wife has been rejected by the jury on both the first and second trial; and, in our opinion, the judgment now appealed from should be affirmed.

Affirmed.